876 P.2d 1314

**GREAT AMERICAN INSURANCE COMPANY, Plaintiff–Appellant,**

v.

**AETNA CASUALTY AND SURETY COMPANY, Defendant–Appellee.**

No. 16192.

Supreme Court of Hawai'i.

July 18, 1994.

Michael F. McCarthy and Michael D. Formby, on the briefs, Honolulu, for plaintiff-appellant Great American Ins. Co.

Kenneth S. Robbins and Vincent A. Rhodes, on the briefs, Honolulu, for defendant-appellee Aetna Cas. and Sur. Co.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

MOON, Chief Justice.

Great American Insurance Co. (Great American) filed an action for declaratory relief and contribution against Aetna Casualty and Surety Co. (Aetna) in the United States District Court for the District of Hawai'i, claiming that Aetna was required to contrib-

ute defense costs paid by Great American on behalf of a mutual insured, Mitsui & Co., Inc. (Mitsui). Aetna contended that it was not required to contribute defense costs incurred prior to its receiving notice of the underlying lawsuit against Mitsui. Both parties moved for summary judgment.

The federal district court concluded that there was no clear, controlling precedent in Hawai'i law and, therefore, certified the following question to this court:

> Does Aetna's duty to defend Mitsui include the duty to contribute to defense costs incurred before Aetna had notice of the claim against Mitsui, and, if so, must Aetna demonstrate prejudice to be excused from making such contribution?

We hold that Aetna's duty to defend Mitsui does not include the duty to contribute to defense costs incurred before Aetna had notice of the claim against Mitsui because it is clear on the record before us that Mitsui waived any claim against Aetna to make such contribution. Therefore, we need not address the second part of the certified question regarding the issue of prejudice.

## I. BACKGROUND

Mitsui is a wholesaler and one of several companies that supplied steel used in the construction of the Aloha Stadium. On June 22, 1982, the State of Hawai'i (the State) filed suit against twelve defendants, including Mitsui, for damages arising from allegedly defective steel provided by the defendant companies. Mitsui filed its answer to the lawsuit in December 1982 and subsequently tendered its defense to one of its insurers, Great American, on or about December 1, 1983. Between December 1982 and December 1983, Mitsui had accumulated approximately $77,500.00 in legal fees. In February 1984, the State filed an amended complaint, adding to the list of defendants Nippon Steel, Inc. (Nippon), the original supplier of the steel to Mitsui.

In April and May 1985, Great American accepted the defense of Mitsui, but declined to pay the $77,500.00 in legal fees already incurred by Mitsui. Between the date of tender in December 1983 through September 1985, Great American paid $276,945.88 toward Mitsui's defense. Despite repeated requests by Great American to Mitsui for the names of its previous insurers, it was not until January 1987 that Great American learned that Aetna had also insured Mitsui from April 1976 to April 1978.[1] Aetna's insurance policy with Mitsui included the following provision regarding the "[i]nsured's duties in the event of occurrence, claim or suit," which provided, in relevant part:

> (b) If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.

The policy also provided that "[n]o action shall lie against the company unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy[.]"

On February 11, 1987, Great American notified Aetna of the State's lawsuit against Mitsui. There is nothing in the record to indicate that Mitsui had anything to do with Great American's notification of Aetna. However, it is undisputed that this was Aetna's first notice of the lawsuit. It is also undisputed that by this time, Aetna's identity as one of Mitsui's insurers had been a matter of public record for more than three years as a result of Mitsui's answers to interrogatories produced earlier in the suit. Great American demanded that Aetna contribute to the payment of Mitsui's defense costs that had accrued before Aetna received notice of the suit.

Meanwhile, Mitsui, Great American, and Nippon had been engaged in settlement negotiations, primarily concerning the possible

---

1. It was subsequently determined that Aetna had in fact provided some type of liability insurance to Mitsui from 1962 through 1978.

indemnification of Mitsui by Nippon. In early April 1987, Nippon had offered to assume the defense of Mitsui as of December 1, 1986, and to indemnify Mitsui for all claims, conditioned upon Nippon being exonerated from responsibility for any of Mitsui's defense costs prior to December 1, 1986. Additionally, Mitsui offered to relinquish its claim against Great American for the $77,500.00 in defense costs incurred prior to its tender of defense to Great American. Great American notified Aetna of the settlement offer on June 10, 1987; however, Aetna advised Great American that it would not be a party to the settlement.

Although Great American had received the original settlement offer in April 1987, it was not finalized as a written settlement agreement and signed by the participating parties, Nippon, Mitsui, and Great American, until approximately June 10, 1988. Following execution of the settlement agreement, Great American paid an additional $101,314.11 in Mitsui's defense costs to cover the period from September 1985 to December 1, 1986, when Nippon assumed all of Mitsui's defense obligations. Great American thus paid a total of $378,259.99 to cover Mitsui's defense costs from December 1, 1983 to December 1, 1986.

On September 28, 1988, Great American filed a lawsuit for declaratory relief and contribution against Aetna in the United States District Court for the District of Hawai'i, claiming that Aetna should be required to contribute to the defense costs paid by Great American prior to Aetna's having received notice of the State's lawsuit against Mitsui. Aetna subsequently filed a motion for summary judgment, essentially contending that it could not be held responsible for defense costs incurred before it had received notice of Mitsui's lawsuit. Great American then filed a cross-motion for summary judgment, primarily claiming that Aetna, in fact, had a legal obligation to contribute to the defense costs paid by Great American.

On April 10, 1989, the federal district court held a hearing on both summary judgment motions. Great American and Aetna argued their respective positions, but the court ultimately focused on a single case from this court—*Standard Oil Co. of California v. Hawaiian Insurance & Guaranty Co., Ltd.*, 65 Haw. 521, 654 P.2d 1345 (1982)—which it thought might provide the rule of decision for the instant motions:

THE COURT: Okay. Now, in that Standard Oil case the Hawai'i Supreme Court held that the function of the notice requirements are simply to prevent the insurer from being prejudiced, not to provide a technical escape hatch. Now assume no notice had been given and there was no prejudice, the Standard Oil case seems to say that the insurer in that situation then is responsible for the costs of defense.

[COUNSEL FOR AETNA]: I understand the case differently, Your Honor, because I understand notice to be used in two different contexts. . . .

THE COURT: Well, I'm concerned with the Hawai'i decision in the Standard Oil case.

[COUNSEL FOR AETNA]: Yes, Your Honor.

THE COURT: And it seemed to say: If there's no notice, then the insurance company is still responsible, unless it can show prejudice.

[COUNSEL FOR AETNA]: Well, I think we can do that, which is a separate argument—

THE COURT: Well, that's a separate argument, yeah, but it seems to say that unless you show prejudice, you're still on the hook.

[COUNSEL FOR AETNA]: Well, I agree that you are on the hook from the point that you are given notice. The question is one of whether that's a retrospective duty.

THE COURT: Well, what else does it mean? That seems to be what the holding says, isn't it?

[COUNSEL FOR AETNA]: I understand it differently, Your Honor, because I believe there's [sic] simply two different issues[.]

THE COURT: What does the Hawai'i Supreme Court mean when it says: Even though there's no notice, you must show prejudice[?]

Following the hearing, the federal district court found that "the question whether Aetna must demonstrate substantial prejudice in order to be excused from contributing to the defense costs incurred before it was notified of Mitsui's involvement in the lawsuit is determinative in this action and that there is no clear controlling precedent in Hawai'i law." Consequently, on August 15, 1989, the federal court certified the following question to this court:

Assuming Aetna otherwise has a duty to defend Mitsui, does it include the duty to contribute to defense costs incurred before Aetna had notice of the claim against Mitsui, and, if it does, must Aetna demonstrate substantial prejudice to be excused from making such contribution?

On May 30, 1990, this court dismissed the certified question, stating that Aetna's duty to defend Mitsui, if any, should be determined by the federal district court before submission of the certified question. On October 2, 1990, the federal court ruled that Aetna did have a duty to defend in the State's lawsuit. Thereafter, on November 26, 1990, the federal court certified the following question to this court:

Does Aetna's duty to defend Mitsui include the duty to contribute to defense costs incurred before Aetna had notice of the claim against Mitsui, and, if so, must Aetna demonstrate prejudice to be excused from making such contribution?

However, the party responsible for filing the question with this court failed to pay the necessary filing fee and, thus, the certified question was never filed.

When the oversight was discovered by the federal district court in 1992, it ordered the parties to research the issue again and file new memoranda. Subsequently the federal district court found that there was still no clear, controlling precedent in Hawai'i law on the issue and, thus, certified the aforementioned question to this court.

## II. *DISCUSSION*

### A. *The Standard Oil Case*

As previously noted, the federal district court focused on this court's decision in *Standard Oil* in its attempt to properly dispose of the instant case. However, because our decision in *Standard Oil* resulted from a petition for certiorari from an earlier decision of the Intermediate Court of Appeals (ICA), a discussion of the ICA's ruling in *Standard Oil Co. of California v. Hawaiian Insurance & Guaranty Co., Ltd.*, 2 Haw.App. 451, 634 P.2d 123 (1981), is required.

In May 1973, a private airplane crashed near the Honolulu International Airport killing all six people on board—the pilot and his five passengers. It was subsequently determined that the plane's left engine had failed, and that there had likely been contaminants in the fuel feeding the engine. The fuel tanks had been filled by a fuel truck owned by Standard Oil of California (SOCAL) and operated by Air Service Corporation (ASC). The fuel had been supplied by Associated Aviation Activities (AAA). All three companies were insured by Hawaiian Insurance & Guaranty Company, Ltd. (HIG) under a comprehensive general liability insurance policy, which included coverage for negligence in the maintenance of the fuel truck, including the loading and unloading of the truck. *Id.* at 452–53, 634 P.2d at 124–25.

Two lawsuits were subsequently filed in December 1973 by families of the passengers against both the pilot and unnamed Doe defendants. The pilot's estate then impleaded ASC, who forwarded the complaint to HIG. ASC was also identified as a Doe defendant in September 1974, AAA in February 1975, and SOCAL in June 1975. Meanwhile, in February 1975, the pilot's estate also filed

suit against ASC and AAA. Both companies forwarded the complaints to HIG. All three lawsuits were then consolidated, and in all three, SOCAL was impleaded by both ASC and AAA in June 1975. *Id.* at 453–54, 634 P.2d at 125. However, SOCAL did not forward the complaints and tender its defense to HIG until January 13, 1976. *Id.* at 455, 634 P.2d at 126.

HIG refused to defend any of the three companies in the actions. Instead, ASC and AAA were defended by another insurance company (Southern Marine) pursuant to a separate aviation insurance policy, while SOCAL was forced to defend itself. All three companies settled with all plaintiffs. *Id.*

Following these settlements, ASC, AAA, and Southern Marine in one case, and SOCAL in a separate action, sued HIG for settlement costs and for the costs of defending the lawsuits. These cases were consolidated. *Id.* The circuit court ultimately granted summary judgment in favor of SOCAL, ASC, AAA, and Southern Marine, ruling that HIG had failed to comply with the duty to defend under its insurance policy with the three companies, and that HIG was therefore liable for both settlement and defense costs. HIG appealed. *Id.* at 457–458, 634 P.2d at 127.

In its appeal to the ICA, HIG primarily contended that it had not received proper and timely notice of the original lawsuits from all of the insured companies as required by the insurance policy. HIG focused especially on the fact that SOCAL had allowed some seven months to elapse between the time it was impleaded in June 1975 and its eventual tender of its defense to HIG in January 1976. HIG argued that because there had been no timely notice, its duty to defend had not been activated and, therefore, it could not be held liable for either settlement or defense costs. *Id.* at 460, 634 P.2d at 129.

The ICA disagreed with HIG on the significance of SOCAL's late tender of its defense,

noting that one of HIG's insureds under the policy, ASC, had been impleaded by the pilot's estate and had duly tendered its defense to HIG at a very early stage of the original litigation. The ICA ruled that HIG had thereby been put on adequate notice that "there was a potential liability for the covered risk[.]" *Id.* The ICA concluded that

[t]he insured is required by the policy to give notice and forward the pleadings to the insurer. ASC and AAA did so. We do not think the result is changed by the fact that an additional insured [SOCAL] was brought into the case by a later pleading and no additional notice was sent to HIG. HIG was already on notice of the potentiality with respect to the risk insured against and the joinder of an additional insured in the proceedings did not increase or change HIG's potential liability at all.

*Id.* at 460–61, 634 P.2d at 129. Consequently, the ICA held that HIG had in fact received timely notice from its insureds as required by the policy.

HIG subsequently filed a petition for certiorari to this court to review the ICA's decision, which we granted "for the purpose of determining whether the appeals court erred in holding as a matter of law that HIG had been properly and seasonably notified." *Standard Oil*, 65 Haw. at 522, 654 P.2d at 1346. We noted that the policy in question contained the following language as a condition of coverage: [2] "If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative." *Id.* at 525, 654 P.2d at 1348. But we agreed with the ICA that under the circumstances of the case, the actions of both ASC and AAA adequately fulfilled the foregoing notice requirement. *Id.* at 526, 654 P.2d at 1348.

Additionally, this court appended to the specific holding in *Standard Oil* a lengthy footnote (hereinafter "footnote 4") in which

---

**2.** "Coverage," as that term is utilized in this opinion, encompasses the duties to defend, pay

for defense costs, and provide liability coverage.

we agreed with the ICA that SOCAL's late entry into the original litigation and SOCAL's delay in tendering its defense to HIG should not affect the conclusion with respect to the issue of timely notice. However, this court concluded footnote 4 with the following pronouncement:

> And as the court in *Miller v. Marcantel,* 221 So.2d 557, 559 (La.Ct.App.1969), has pointed out:
>
>> The function of the notice requirements is simply to prevent the insurer from being prejudiced, not to provide a technical escape-hatch by which to deny coverage in the absence of prejudice nor to evade the fundamental protective purpose of the insurance contract to assure the insured and the general public that liability claims will be paid up to the policy limits for which premiums were collected.
>
> Upon reviewing the record, we find that HIG suffered no prejudice by SOCAL's delay in forwarding the papers to HIG.

*Id.* at 526 n. 4, 654 P.2d at 1348 n. 4.

By this comment, this court appeared to suggest that even where the insurer can show untimely notice on the part of its insured, the insurer will additionally be required to show that it was prejudiced by the late notice in order to deny coverage under the policy. However, because we agreed with the ICA's ruling, and specifically held that HIG had in fact been timely notified, the foregoing comment on an additional prejudice requirement was *dictum.*

Although the import of footnote 4 was not part of our holding in *Standard Oil,* this court left the impression that, faced with the proper case, we would require an insurer to show prejudice before we would allow the insurer to deny coverage under a policy because of a breach of the immediate notice provision by an insured. This seems to have been precisely the impression conveyed to the federal district court in the instant case. It seems clear that the federal court has certified the question now before us in order

to clarify what we meant by the *dictum* in footnote 4. However, based on our disposition of the certified question, we do not deem it necessary to do so because the record is clear that Mitsui waived any claim against Aetna to contribute to defense costs incurred before Aetna had notice of the claim.

### B. Insured's Waiver of Insurer's Duty to Defend

" 'Waiver' is generally defined as "the *intentional relinquishment* of a known right," "a voluntary relinquishment of some rights" and "the relinquishment or refusal to use a right." *State Sav. & Loan Ass'n v. Kauaian Dev. Co., Inc.,* 50 Haw. 540, 557, 445 P.2d 109, 121 (1968) (quoting *Robinson v. McWayne,* 35 Haw. 689, 719 (1940)) (emphasis in *State Sav. & Loan* ); *Uncle John's of Hawai'i v. Mid–Pacific Restaurants,* 71 Haw. 412, 417, 794 P.2d 614, 616–17, *reconsideration granted,* 71 Haw. 666, 833 P.2d 900 (1990).

In *Fireman's Fund Insurance Companies v. Ex–Cell–O Corp.,* 790 F.Supp. 1318 (E.D.Mich.1992), the Michigan federal district court recognized that the insured had waived its claim for defense costs prior to giving notice. The procedural history of the case is complex; however, the relevant fact for purposes of the present discussion is that certain insureds under policies with Employers Insurance of Wausau (Wausau) were seeking contribution towards defense costs incurred prior to untimely notice of the claim to Wausau in violation of a policy requirement of immediate notice identical to that contained in Aetna's policy with Mitsui. The policyholders argued that, notwithstanding the undisputed untimely notice, Wausau was required, under Michigan law, to show prejudice in order to be relieved of its duty to contribute to defense costs incurred prior to notice. *Id.* at 1322–25.

The court in *Fireman's Fund* noted that in Michigan, "late notice to an insurer is not a defense to *coverage* unless the insurer can demonstrate that it ha[s] been prejudiced by the delay." *Id.* at 1325 n. 4 (emphasis in

original). However, following a lengthy analysis of relevant Michigan cases, the court concluded that an insurer should not be required to make a showing of prejudice when the issue involves waiver of the insurer's liability to contribute to defense costs incurred prior to notice of a claim.

The court reasoned that

Michigan courts have held that late notice is a defense to the duty to indemnify only if the insurer can demonstrate prejudice in its ability to defend and defeat the award that is being sought to be indemnified. Yet, the issue in these cases is whether the insured does or does not have the *status* of being covered with indemnity protection for past wrong-doing. Questions of one's insured *status* must be answered with either a "yes" or a "no." The resolution of the issue is non-divisible. On the other hand the computation of defense costs relates both to past and future actions involved in the defense of a case. It is divisible. An insured can waive some past defense cost coverage without waiving future coverage. Unlike one's indemnity status for a past wrong, computation of defense costs can be allocated or divided along a time line. The moment of tendering the defense is the critical point in such a calculation. Because defense costs are more reasonably subject to allocation, an insured can waive part of its right to a defense without waiving it all.

*Id.* at 1330 (underscore in original) (bold added) (footnote omitted).

Here, it is undisputed that prior to Aetna receiving notice of the lawsuit on February 11, 1987, Mitsui had been served with the complaint in July 1982 and presumably knew by its records that Great American and Aetna had been its insurers during periods po-

tentially relevant to allegations within the complaint. Despite the availability of coverage for defense costs, Mitsui voluntarily chose to retain its own counsel until it tendered its defense to Great American on December 1, 1983, after incurring approximately $77,500 in legal fees. Upon accepting Mitsui's defense on April 23, 1985 and May 13, 1985, Great American repeatedly requested names of Mitsui's other insurers. However, it was not until January 9, 1987 that Mitsui disclosed to Great American that Aetna had insured Mitsui from April 1, 1976 through April 1, 1978. Of paramount significance is that the information regarding Aetna's identity as Mitsui's insurer from April 1976 to April 1978 was a matter of public record as a result of Mitsui's answers to interrogatories filed on December 22, 1983, over three years before Aetna received notice of the lawsuit. Considering the totality of circumstances, we hold, as a matter of law, that Mitsui waived any claim against Aetna based on its duty to defend up to February 11, 1987 when Aetna received notice.

## III. CONCLUSION

Based on the foregoing, we answer the certified question by stating that under Hawai'i law, Aetna had no duty to contribute to defense costs incurred prior to its receiving notice of the underlying action. Having answered the first part of the certified question in the negative, we need not address the second part of the question regarding the issue of prejudice.