**AMERICAN MUTUAL LIABILITY INSURANCE COMPANY, Plaintiff and Counter–Defendant,**

v.

**BEATRICE COMPANIES, INC.,
Defendant–Counterplaintiff and Third–Party Plaintiff**

v.

**TRANSPORT INSURANCE COMPANY, National Surety Corporation California Union Insurance Company, Northbrook Insurance Company, Allianz Underwriters, Inc. Arthur J. Gallagher & Co., Gallagher–Bassett Insurance Services, Inc., and Liberty Mutual Insurance Company, Third–Party Defendants.**

No. 86 C 1874.

United States District Court,
N.D. Illinois,
Eastern Division.

April 2, 1996.

Order Granting in Part Motion
to Amend April 25, 1996.

**864**

Elizabeth M. Budzinski, Wilson, Elser, Moskowitz, Edelman & Dicker, Chicago, IL, for third-party defendant Liberty Mutual Insurance Company.

David Eugene Trainor, John Peter Maniatis, Tressler, Soderstrom, Maloney & Priess, Chicago, IL, for third-party defendant Northbrook Insurance Company.

Kevin R. Sido, Paul G. Roberts, Hinshaw & Culbertson, Chicago, IL, Robert L. Kiesler, Jeanne M. Zeiger, Kiesler & Berman, Chicago, IL, for third-party defendants Arthur J. Gallagher & Co., Gallagher–Bassett Services, Inc.

### MEMORANDUM OPINION AND ORDER

ANN CLAIRE WILLIAMS, District Judge.

In this case, Beatrice Co., Inc. ("Beatrice") seeks to recover nearly seven million dollars in defense costs from various insurance companies. The defense costs were incurred in a federal action brought by citizens of the city of Woburn, Massachusetts ("*Anderson* action").[1] Before the court are numerous motions for summary judgment with approximately 3000 pages of supporting documentation. For the reasons that follow, the court denies Beatrice's motions for summary judgment and grants the motions of all the insurers.

### Background

In May 1979, it was discovered that two wells providing drinking water for the city of Woburn, Massachusetts were contaminated with toxic solvents, including trichloroethylene, tetrachloroethylene, benzene, and chloroform. *Anderson*, 862 F.2d at 913. The city declared an emergency and immediately closed the wells.

On May 18, 1982, a lawsuit was filed in the United States District Court for the District of Massachusetts by Woburn residents who ingested water from the contaminated wells during the late 60's and 70's. *Id.* at 914. Eventually, there were 34 plaintiffs in the *Anderson* action, who alleged that they suffered various injuries attributable to the

---

1. The details of the underlying litigation are extensively laid out in the opinions generated by the case. *See Anderson v. Cryovac, Inc.,* 96 F.R.D. 431 (D.Mass.1983); *Anderson v. W.R. Grace & Co.,* 628 F.Supp. 1219 (D.Mass.1986); *Anderson v. Cryovac, Inc.,* 805 F.2d 1 (1st Cir. 1986); *Anderson v. Cryovac, Inc.,* 862 F.2d 910 (1st Cir.1988); *Anderson v. Beatrice Foods Co.,* 127 F.R.D. 1 (D.Mass.1989); *Anderson v. Beatrice Foods Co.,* 129 F.R.D. 394 (D.Mass.1989); *Anderson v. Beatrice Foods Co.,* 900 F.2d 388 (1st Cir.), *cert. denied,* 498 U.S. 891, 111 S.Ct. 233, 112 L.Ed.2d 193 (1990).

drinking water, including leukemia. *See id.* The claims sounded in negligence, nuisance and strict liability. *Id.* Each of the *Anderson* defendants owned one of the three properties identified by the EPA as possible sources for the contamination: (1) a manufacturing plant owned by W.R. Grace & Co. ("Grace"); (2) premises controlled by Unifirst Company; and (3) a 15-acre parcel of wetland that is the focus of this dispute. *Id.*

The 15-acre tract had been purchased by the John J. Riley Company ("Riley") in 1951. *Id.* at 913–14. Riley operated a tannery on nearby property and installed a production well on the 15-acre tract. *Id.* Effective December 28, 1978, Beatrice acquired Riley, including its real estate and environmental liabilities. *Id.* at 914. The complaint alleged that Riley had disposed of toxic chemicals on the 15-acre tract, thereby contaminating the well. (*See generally* Stip.App. Ex. 16(e).) The *Anderson* complaint named both Riley and Beatrice as defendants. (*See* Stip.App. Ex. 16(a).)

## I. DEFENSE OF THE *ANDERSON* ACTION

Beatrice contracted three law firms to defend the *Anderson* action. Two of the firms represented Beatrice and Riley, respectively, at trial. A third law firm served as counsel on environmental issues. Discovery lasted four years, with a first-phase trial starting in March of 1986.[2] After a 78-day trial, the jury returned a verdict in favor of Beatrice, finding insufficient evidence that any of the chemicals Riley used at the tannery reached the municipal wells. *Id.* at 914–15. The trial judge amended the verdict pursuant to Federal Rule of Civil Procedure 49(a), made additional findings, and entered judgment for Beatrice. *Id.* Thereafter, the *Anderson* plaintiffs appealed.

While the appeal was pending, the plaintiffs learned that, back in 1983, Riley had commissioned YANKEE Environmental Engineering and Research Services, Inc. ("YEERS") to perform a hydrogeological in-

vestigation of the tannery. *See Anderson,* 862 F.2d at 922. In addition, the plaintiffs discovered that a follow-up of the report had been prepared in 1985 by Geotechnical Engineers, Inc. *Id.* at 922 n. 8. Beatrice submitted the reports to the United States Environmental Protection Agency ("USEPA") in December 1986, but had not produced them during discovery. *Id.* at 922.

The plaintiffs moved for a new trial on the grounds of newly discovered evidence or, in the alternative, that the reports had been improperly withheld during discovery under circumstances that constituted fraud or misrepresentation. *Id.* at 922–23. The district court ruled in Beatrice's favor, but the plaintiffs appealed. *Id.* The appeal on this issue was consolidated with the appeal from the adverse verdict. *Id.* at 915.

The court of appeals concluded that there was clear and convincing evidence Beatrice had engaged in misconduct. *Id.* at 927. However, it could not determine on the record before it whether the reports were sufficiently valuable to merit a finding of substantial interference. *Id.* at 922–32. As such, the appellate court remanded the case to the district court for further proceedings. *Id.* at 932.

On remand, the district court conducted an evidentiary hearing lasting seventeen days. The judge found that Beatrice's attorneys knew about the hydrogeology report before trial and that their failure to produce it constituted a lapse in judgment. *Anderson,* 127 F.R.D. at 2–3. With respect to the Riley attorneys, the court concluded that there had been deliberate misconduct. *Id.* at 5–6. Nevertheless, the district court held that Beatrice and Riley overcame the presumption that the misconduct would have affected the result at trial. *Id.* at 7–9; *Anderson,* 129 F.R.D. at 401–03. The appellate court affirmed, *Anderson,* 900 F.2d at 391–93, and the Supreme Court denied certiorari. *Anderson,* 498 U.S. 891, 111 S.Ct. 233.

By the time the last appeal was completed in the *Anderson* action, the total fees and

---

**2.** The first phase focused on whether defendants had disposed of chemicals on the 15-acre tract prior to the closing of the wells and, if so, whether the chemicals they dumped contributed to the contamination. Issues regarding causation and damages were reserved for phases II and III, respectively. *Anderson,* 862 F.2d at 914.

expenses of the lawyers, engineers and experts retained by Beatrice totalled seven million dollars. The proceedings regarding misconduct, alone, cost approximately 2.8 million dollars. (National Surety's Mem. at 43.) In this case, Beatrice seeks to recover its defense costs from various insurance companies that covered Beatrice and Riley.[3]

## II. THE INSURERS

Riley was insured by Liberty Mutual Insurance Company ("Liberty Mutual"), American Mutual, and National Surety Corporation ("National Surety") successively from 1972 to 1979. (Beatrice's 12(m) Stmt. ¶¶ 49, 53, 55.) When Beatrice acquired Riley at the end of 1978, American Mutual and National Surety added Beatrice to their policies as a named insured. (Beatrice's 12(m) Stmt. ¶ 53.)

Beatrice also had its own insurance program in place. Transport Insurance Company ("Transport") provided primary insurance coverage from 1963 to 1987. (Beatrice's 12(m) Stmt. ¶ 18.) In addition, Beatrice carried excess insurance policies between 1977 and 1984. (Beatrice's 12(m) Stmt. ¶¶ 31, 39, 44.) The excess insurers were California Union Insurance Company ("CalUnion"), Northbrook Excess and Surplus Insurance Company ("Northbrook"), and Allianz Underwriters, Incorporated ("Allianz"). (Beatrice's 12(m) Stmt. ¶¶ 31, 39, 44.) The court outlines the pertinent details of the policies below.

### A. Liberty Mutual (Riley Insurer)

Liberty Mutual issued a comprehensive general liability policy to Riley covering the period from May 2, 1972 through May 2, 1973. (Stip.App.Ex. 13.)[4] Liberty Mutual's policy provided coverage in the amount of $500,000 per occurrence. (Stip.App.Ex. 13 at 1.) Under the policy, Liberty Mutual agreed to indemnify Riley for third-party liabilities and had a "right and duty to defend any suit" covered thereunder. (Stip.App.Ex. 14 at 1.) The policy contained the following instruction:

(b) If claim is made or suit brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.

(c) The insured shall cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of bodily injury or property damage with respect to which insurance is afforded under this policy; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of the accident.

(Stip.App.Ex. 14 at 4.) The Liberty Mutual policy also contained a standard provision commonly referred to as a "pollution exclusion," which removed from coverage:

bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

(Stip.App.Ex. 13 at 4.)

### B. American Mutual (Riley Insurer)

American Mutual, which provided Riley with comprehensive coverage from May 2,

---

**3.** This declaratory judgment action was initiated by American Mutual Liability Insurance Company ("American Mutual") against Beatrice. Beatrice responded by filing a third-party complaint against the companies that insured Riley and Beatrice during the relevant time period. The third-party complaint also contains, as an alternative, allegations that Beatrice's insurance broker and insurance administrator were negligent.

The negligence claims are not at issue in these motions.

**4.** Beatrice also contends that Liberty Mutual insured Riley from 1965 to 1972. Although the parties dispute pre–1972 coverage, for purposes of this motion, the court need not decide the issue.

1973 to February 28, 1979, is in liquidation and the proceeding is stayed as to this insurer. (Beatrice's 12(m) Stmt. ¶ 56.)

### C. National Surety (Riley Insurer)

National Surety issued a policy to Riley covering the period between December 5, 1978 and February 28, 1979. (Beatrice's 12(m) Stmt. ¶ 53; Stip.App.Ex. 15.) National Surety added Beatrice as a named insured after Beatrice acquired Riley. (Stip.App.Ex. 15, endorsement I.) The policy granted coverage up to $500,000 per occurrence. (Stip.App.Ex. 15.) Under the policy, National Surety had a right and duty to defend Riley and Beatrice from all claims potentially covered by the policy. (Stip.App.Ex. 15 at 1.) Like Liberty Mutual's policy, National Surety's policy required immediate notification of any claim or suit. (Stip.App.Ex. 15 at 15.) National Surety's contract contained a standard pollution exclusion. (Stip.App.Ex. 15 at 1.)

### D. Transport (Beatrice Primary Insurer)

Transport was Beatrice's primary insurer from 1963 to March 1, 1987. (Beatrice's 12(m) Stmt. ¶¶ 18–23; Stip.App.Exs. 1–5.) Before March 1, 1977, the policies provided unlimited indemnity. (Beatrice's 12(m) Stmt. ¶¶ 25, 28; Stip.App.Exs. 1–2.) However, after March 1, 1977, Beatrice converted to a self-insured retention under which Transport "fronted" up to $500,000 per occurrence, an amount equal to Beatrice's deductible. (Beatrice's 12(m) Stmt. ¶ 29.) Both parties agree that the only policies at issue in this litigation are the pre-fronting policies providing actual insurance coverage. As such, all references to Transport policies are to the pre–1977 policies at issue.

Transport's policies indemnified Beatrice for loss in excess of the retention and for "loss adjustment expense" defined as "court costs … and investigation, adjustment and legal expenses (excluding all expenses for salaried employees and retained counsel of and all office expenses of the INSURED)". (Stip.App.Exs. 1–5 §§ II–III.) The notice provisions, which differed slightly from the provisions of the other primary insurers, provided:

> Upon the happening of any accident or occurrence likely to involve the indemnity provided under this AGREEMENT, the INSURED shall give immediate written notice with the fullest information obtainable to the COMPANY at its Dallas office. If thereafter any suit or other proceeding is instituted against the INSURED, the INSURED shall immediately advise the COMPANY in like manner.

(Stip.App.Exs. 1–5, § 6.) Some of the policies contained standard pollution exclusions. (Stip.App.Ex. 3, endorsement 24; Stip.App.Ex. 4, endorsement 1; Stip.App.Ex. 5, endorsement 9.)

### E. CalUnion (Beatrice Excess Insurer)

Between March 1, 1977 and March 1, 1981, CalUnion provided Beatrice with excess coverage. (Beatrice's 12(m) Stmt. ¶¶ 31, 33–37; Stip.App.Exs. 7–8.) During that period, the first layer of Beatrice's insurance program was the self-insured retention "fronted" by Transport. (Beatrice's 12(m) Stmt. ¶¶ 18–29; Stip.App.Exs. 1–5.) The CalUnion policies at issue provided a $500,000 buffer layer of excess insurance between Transport and Northbrook. (Beatrice's 12(m) Stmt. ¶¶ 33–34, 36; Stip.App.Exs. 7–8, item 3 & endorsement 1.) CalUnion had no obligation to defend Beatrice, but reserved the right to associate with the insured in defense of claims "reasonably likely" to involve the policies. (Stip.App.Exs. 7–8, § C.) The contracts warned, "no obligation shall be incurred on behalf of the Company without its consent being first obtained." (Stip.App.Exs. 7–8, § C.)

### F. Northbrook (Beatrice Excess Insurer)

The excess policies issued by Northbrook indemnified Beatrice for "ultimate net loss" in excess of either the limits of the underlying insurance or a designated retained limit. (Beatrice's 12(m) Stmt. ¶ 42; Stip.App.Exs. 9–10.) For the period of March 1, 1977 to March 1, 1979, Northbrook provided $19 mil-

lion of coverage.[5] (Beatrice's 12(m) Stmt. ¶ 40; Stip.App.Ex. 9.) From March 1, 1979 to March 1, 1981, the coverage was only $5 million. (Beatrice's 12(m) Stmt. ¶ 41; Stip. App.Ex. 10.) The Northbrook policies required Beatrice to provide notice "as soon as practicable" after receiving:

> information from which the Insured may reasonably conclude that an Occurrence covered hereunder · involves injuries or damages which, in the event that the Insured should be held liable, is likely to involve this policy . . . .

(Stip.App.Ex. 9, condition VII; Stip.App.Ex. 10, endorsement 9.) The policies contained standard pollution exclusions. (Stip.App.Exs. 9–10, exclusion I.)

### G. Allianz (Beatrice Excess Insurer)

Allianz issued an umbrella liability policy providing excess coverage from March 1, 1981 through March 1, 1984. (Beatrice's 12(m) Stmt. ¶ 44.)[6] During this period, the only coverage below Allianz was Transport's "fronting" policy. (See Beatrice's 12(m) Stmt.Ex. A.) Under the policy, Allianz provided $25 million of coverage in excess of the limits of the underlying coverage. (Stip.App.Ex. 11 at 1.) The Allianz contract contained a notice provision identical to Northbrook's. (Stip.App.Ex. 11 at 6.) The policy also contained a standard pollution exclusion. (Stip.App.Ex. 11 at 3.)

### III. BEATRICE NOTIFIES INSURERS OF THE ANDERSON CLAIMS

When the complaint was filed in 1982, Gallagher Bassett Insurance Services ("Gallagher–Bassett") served as Beatrice's claims administrator.[7] Typically, when Beatrice was sued, the law department would transmit the complaint to the insurance department for delivery to Gallagher–Bassett. Beatrice contends that Gallagher–Bassett

was its "agent" for purposes of notifying the insurers of claims.[8] (Beatrice's Mem. on Late Notice at 2.)

As early as June of 1982, Beatrice's attorneys concluded that the availability of insurance should be explored and appropriate carriers notified. (See Liberty Mutual's Mem. Ex. I.) It is clear that the attorneys communicated their concerns over insurance coverage some time before December 1984. (See Allianz's 12(m) Stmt.Ex. G.) However, it was more than a year before any of the insurers received notice of the Anderson matter. Beatrice informed National Surety of the litigation in August 1985; Transport, CalUnion, Northbrook and Allianz in January 1986; and Liberty Mutual in October 1986. The first phase trial began on March 10, 1986.

### IV. MOTIONS BEFORE THE COURT

#### A. Liberty Mutual (Riley Insurer)

Liberty Mutual has moved for summary judgment on the grounds that Beatrice: (1) breached the timely notice provision of the policy; (2) breached the voluntary payment condition; (3) cannot recover defense costs incurred prior to the time it received notice of the claims; and (4) is not entitled to coverage for the Anderson claims because they fall within the pollution exclusion.

#### B. National Surety (Riley Insurer)

National Surety has moved for summary judgment on the grounds that: (1) Beatrice breached the timely notice provision of the agreement; (2) there is no duty to reimburse Beatrice for defense costs incurred prior to National Surety's receiving notice of the action; (3) the Anderson claims fall under the pollution exclusion; and (4) the claims are barred from coverage because they do not

---

**5.** The original policy went into effect on March 28, 1976 and provided $24 million of coverage. However, as of March 1, 1977, the limits were reduced to $19 million.

**6.** Initially, Beatrice made claims for coverage under two Allianz policies. Beatrice has since withdrawn its claim under one of the policies leaving only one Allianz policy at issue in this case.

**7.** Arthur J. Gallagher & Company ("Arthur Gallagher"), Gallagher–Bassett's parent company, was Beatrice's insurance broker.

**8.** Gallagher–Bassett disputes Beatrice's contention that it was responsible for providing notice of the Anderson litigation to the insurers.

arise out of the premises designated in the National Surety contract.

### C. Transport (Beatrice Primary Insurer)

Transport has moved for summary judgment on the grounds that: (1) Beatrice violated the notice requirements of the policies; and (2) its policies did not cover occurrences attributable to Riley operations prior to the time that Beatrice acquired Riley.

### D. Northbrook (Beatrice Excess Insurer)

Northbrook has moved for summary judgment on the grounds that: (1) Beatrice did not give timely notice of the claim; (2) Beatrice cannot recover defense costs incurred before giving notice or fees related to attorney misconduct; (3) the pollution exclusion bars coverage; and (4) as an excess carrier, it is not liable for defense costs unless and until the underlying layers of insurance coverage are exhausted.

### E. Allianz (Beatrice Excess Insurer)

Allianz has moved for summary judgment on the grounds that Beatrice failed to provide timely notice of the *Anderson* action.[9]

### F. CalUnion (Beatrice Excess Insurer)

CalUnion has moved for summary judgment on the grounds that: (1) Beatrice forfeited coverage by providing late notice; (2) its policy does not cover defense costs; and (3) as an excess carrier, it is not liable for defense costs unless and until the underlying layers of insurance coverage are exhausted.[10]

### G. Beatrice

Beatrice has cross-moved for (1) summary judgment against National Surety and Liberty Mutual on their late notice defenses; and (2) partial summary judgment against Transport on its defense regarding coverage for Riley's pre-merger conduct. In addition, Beatrice seeks partial summary judgment against all the insurers on the grounds that (1) the *Anderson* complaint alleged bodily injury within the meaning of the policies; (2) all the policies were triggered by the *Anderson* allegations; and (3) the pollution exclusion does not relieve any of the carriers of their obligations to defend or indemnify.

### *Summary Judgment*

A court renders summary judgment where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A court determines whether a fact is "material" by referring to the substantive law that governs the claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment must be granted if no reasonable trier of fact could find for the non-moving party. *Id.* at 249, 106 S.Ct. at 2510.

### *Analysis*

■ At the outset, because this is a diversity action, the court must perform a choice of law analysis. All parties agree that Massachusetts law applies to the claims against the Riley carriers (Liberty Mutual and National Surety). As for the Beatrice carriers (Transport, CalUnion, Northbrook and Allianz) all parties except Northbrook agree that Illinois law applies. According to Northbrook, Massachusetts law governs the interpretation of its policy.

A federal court sitting in diversity applies the choice of law principles of the state in which it sits. *Klaxon Co. v. Stentor Electric*

---

9. Allianz also sought summary judgment as to one of its policies on the grounds that the policy was issued after the *Anderson* litigation had begun and the policy did not cover a known loss. The court need not address the known loss issue because the parties have reached an agreement with respect to that policy.

10. CalUnion also raised the issue of whether, as a Beatrice insurer, it could be held liable for Riley's pre-merger activities. However, the court need not address the issue as both parties now agree that the issue of pre-merger liability is moot. (*See* Beatrice's Resp. to Transport's Mem. on Pre–Merger Liability at 1 n. 1; CalUnion's Resp. at 2.)

*Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Pittway Corp. v. Lockheed Aircraft Corp.,* 641 F.2d 524, 526 (7th Cir.1981). In contract cases, Illinois courts employ the "most significant relationship" test. *See, e.g., Illinois Tool Works v. Sierracin Corp.,* 134 Ill.App.3d 63, 89 Ill.Dec. 40, 44–45, 479 N.E.2d 1046, 1050–51 (1985); Restatement (Second) of Conflicts of Law § 188. Under this test, the court examines the location of the subject matter of the contract; the domicile, residence, and place of incorporation and place of business of the parties; the place of contracting; the place of negotiations; and the place of performance. *Lapham–Hickey Steel Corp. v. Protection Mutual Ins. Co.,* 166 Ill.2d 520, 211 Ill.Dec. 459, 462, 655 N.E.2d 842, 845 (1995); *Illinois Tool Works,* 89 Ill.Dec. at 45, 479 N.E.2d at 1051.

Beatrice is a Delaware corporation with its principal place of business in Chicago. (Beatrice's 12(m) Stmt. ¶ 2.) Beatrice's Chicago-based insurance broker, Arthur Gallagher, procured the Northbrook policies. (Beatrice's 12(m) Stmt. ¶¶ 10, 43.) Northbrook is an Illinois corporation with its principal place of business in Chicago. (Beatrice's 12(m) Stmt. ¶ 7.) The underlying claim arose in Massachusetts. Because the policies were issued in Illinois by an Illinois insurer, Illinois has the most significant relationship to this litigation. The only connection between this case and Massachusetts is that the underlying claim arose there. All other factors favor Illinois. Therefore, the court concludes that Illinois law governs the claims relating to the Northbrook policy.

## I. LATE NOTICE

As outlined above, all of the policies required the insured to provide prompt notice of occurrences and claims. All of the insurers insist that Beatrice's delay in notifying them of the *Anderson* lawsuit was unreasonable as a matter of law. Beatrice was served with the *Anderson* summons and complaint

on May 18, 1982. It was more than three years later that Beatrice, through its claims administrator, began notifying the insurers. Beatrice informed National Surety of the litigation in August 1985; Transport, CalUnion, Northbrook and Allianz in January 1986; and Liberty Mutual in October 1986. The trial began on March 10, 1986. Because timeliness is analyzed differently under Massachusetts and Illinois law, the court must evaluate the issue separately for the Riley and Beatrice carriers.

### A. Riley Insurers

Some jurisdictions employ a traditional approach to interpreting insurance contracts, treating notice requirements as condition precedents to an insurer's liability. The modern approach, espoused by Massachusetts, is to "eschew such technical forfeitures of insurance coverage unless the insurer has been materially prejudiced by virtue of late notification." *Johnson Controls, Inc. v. Bowes,* 381 Mass. 278, 409 N.E.2d 185, 187 (1980).[11] Massachusetts General Laws, Chapter 175, Section 112, which codifies the modern approach, reads as follows:

> An insurance company shall not deny insurance coverage to an insured because of failure of an insured to seasonably notify an insurance company of an occurrence, incident, claim or of a suit founded upon an occurrence, incident or claim, which may give rise to liability insured against unless the insurance company has been prejudiced thereby.[12]

Mass.Gen.L. ch. 175, § 112. Thus, "[u]nder Massachusetts law, an insurer may disclaim coverage for failure to provide seasonable notice only if that failure has prejudiced the insurer." *Hoppy's Oil Serv., Inc. v. Insurance Co. of N. Am.,* 783 F.Supp. 1505, 1510 (D.Mass.1992). The insurer bears the burden of proving prejudice. *Johnson Controls, Inc.,* 409 N.E.2d at 188; *MacInnis v. Aetna Life & Casualty Co.,* 403 Mass. 220, 526

---

11. In rejecting the traditional approach, courts reason that insurance contracts are not private contracts in the traditional sense because they are not truly negotiated. *Johnson Controls, Inc.,* 409 N.E.2d at 187.

12. This provision was enacted in 1977, but applies prospectively to claims arising after the effective date of the statute. *See Johnson Controls,* 409 N.E.2d at 188. The parties agree that Section 112 applies in this case.

N.E.2d 1255, 1257–58 (1988); Mass.Gen.L. ch. 175, § 112.[13] The test for determining prejudice is whether the underlying purpose of the notice requirement was frustrated by the late notice. *Darcy v. Hartford Ins. Co.,* 407 Mass. 481, 554 N.E.2d 28, 33 (1990). In making such a showing, the insurer must demonstrate that its "interests have been actually harmed." *Id.* 554 N.E.2d at 31–32.

■■■ The insurers place much emphasis on the length of the delay. Although the length of the delay is one of the factors to be considered in deciding whether the insurer has demonstrated actual prejudice, *id.* 554 N.E.2d at 31, the critical inquiry under Section 112 is prejudice.[14] The case law provides very little guidance for evaluating prejudice where the only potential harm to the insurer is the amount of defense costs. In most late notice cases, the insured seeks reimbursement for both damages and defense costs. *See, e.g., Augat, Inc.,* 571 N.E.2d 357; *Darcy,* 554 N.E.2d 28; *New England Extrusion, Inc.,* 874 F.Supp. 467; *Hoppy's Oil Serv., Inc.,* 783 F.Supp. 1505; *Fireman's Fund Ins. Co. v. Valley Manufactured Prods. Co.,* 765 F.Supp. 1121 (D.Mass. 1991), *aff'd,* 960 F.2d 143, 1992 WL 75141 (1st Cir.1992); *see also Metal Bank of Am., Inc. v. Insurance Co. of N. Am.,* 360 Pa.Super. 350, 520 A.2d 493 (1987). Where damages are at issue, the prejudice inquiry revolves around whether critical evidence has been lost, whether the insurer had sufficient opportunity to investigate the claims, and whether the insurer had a chance to settle the claim and avoid liability altogether. *See, e.g., Darcy,* 554 N.E.2d at 31–32 (loss of

critical evidence); *Hoppy's Oil Serv., Inc.,* 783 F.Supp. at 1510–11 (loss of ability to determine whether pollution exclusion barred coverage); *see also Valley Manufactured Prods. Co.,* 765 F.Supp. at 1127–28 (evaluating prejudice even though Section 112 did not apply); *Metal Bank of Am. Inc.,* 520 A.2d at 498 (by the time insurer notified, settlement was a "fait accompli"). In those cases, the inability to control litigation prejudiced the insurer because the insured was ultimately found liable.

■■■ This case is different because Beatrice managed to avoid liability altogether. Since the insurers in this case could not possibly have achieved a better result—even if they had been notified earlier—it makes no difference whether they had an opportunity to develop different facts or settle out from under liability.[15] *See TPLC, Inc. v. United Nat'l Ins. Co.,* 44 F.3d 1484, 1492 (10th Cir. 1995) (insurer's ability to control defense not prejudiced where insured was victorious in underlying suit and attorneys that represented insured were on insurer's list of approved counsel). Where an insurer is not called upon to indemnify for damages, it cannot claim as prejudice that it was unable to develop the facts of a case or to settle a claim for a lower amount.

The insurers also insist they suffered prejudice in that the rates charged by Beatrice's appellate attorneys were far greater than they would have paid their own insurance defense counsel. (*See* Liberty Mutual's Mem. at 22.) The insurers argue that, as major purchasers of legal services, they could

---

13. Insurers are required to demonstrate prejudice when they seek to avoid liability on the basis of an insured's breach of a (1) timely notice provision, *Johnson Controls, Inc.,* 409 N.E.2d at 188; (2) consent-to-settlement provision, *MacInnis,* 526 N.E.2d at 1257–58; or (3) assistance and cooperation provision, *Darcy v. Hartford Ins. Co.,* 407 Mass. 481, 554 N.E.2d 28, 32–34 (1990). However, with respect to voluntary payments, Massachusetts courts do not seem to require the insurer to demonstrate prejudice. *Augat, Inc. v. Liberty Mut. Ins. Co.,* 410 Mass. 117, 571 N.E.2d 357, 361 (1991). *But see New England Extrusion, Inc. v. American Alliance Ins. Co.,* 874 F.Supp. 467, 470–71 (D.Mass.1995) (interpreting *Augat* as requiring a showing of prejudice to avoid liability where insured has breached a voluntary payment provision).

14. On that note, cases to which Section 112 does not apply provide little assistance as they evaluate only the length of the delay without concern for whether the delay prejudiced the insurer. *See Segal v. Aetna Casualty & Sur. Co.,* 337 Mass. 185, 148 N.E.2d 659, 660–62 (1958); *Powell v. Fireman's Fund Ins. Cos.,* 26 Mass.App. 508, 529 N.E.2d 1228, 1230–32 (1988); *Granite State Minerals, Inc. v. American Ins. Co.,* 435 F.Supp. 159, 164–65 (D.Mass.1977).

15. In its motion for summary judgment, even Liberty Mutual concedes that Beatrice "actively and aggressively defended itself." (Liberty Mutual's Mem. at 3.)

have secured better rates. In addition, the insurers complain that they were unable to control the number of hours Beatrice's attorneys expended. In particular, the insurers protest that almost three million dollars of the amount Beatrice now seeks is directly attributable to the misconduct of the attorneys Beatrice chose.[16] In sum, the insurers argue that they were prejudiced because they had no input into the rates the attorneys were paid or the number of hours they billed.

 Upon receiving notice, the insurers had some opportunity to control defense costs; thus, this argument only holds water if the insurers are liable for defense costs incurred before they were notified of the claims. Whether an insurer's inability to control defense costs constitutes prejudice is a difficult question. The answer depends, in part, upon whether the insurers are liable for defense costs incurred before they received notice of the *Anderson* litigation. As a general rule, an insurer has no duty to defend until it receives notice of a claim. *See, e.g., Hoppy's Oil Serv., Inc.,* 783 F.Supp. at 1509 (applying Massachusetts law); *see also* 7C J. Appleman, *Insurance Law and Practice* §§ 4682, 4691 (Berdal ed. 1979); *Lafarge Corp. v. Hartford Casualty Ins. Co.,* 61 F.3d 389, 393 (5th Cir.1995) (applying Texas law); *Solo Cup Co. v. Federal Ins. Co.,* 619 F.2d 1178, 1183 (7th Cir.), *cert. denied,* 449 U.S. 1033, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980) (applying Illinois law); *Pittston Co. v. Allianz Ins. Co.,* 905 F.Supp. 1279, 1312 (D.N.J. 1995) (applying New Jersey law); *Chemical Leaman Tank Lines, Inc. v. Aetna Casualty & Sur. Co.,* 817 F.Supp. 1136, 1160–1161 (D.N.J.1993) (same); *SL Indus. v. American Motorists Ins. Co.,* 128 N.J. 188, 607 A.2d 1266 (1992) (same); *Safeguard Scientifics, Inc. v. Liberty Mut. Ins. Co.,* 766 F.Supp. 324, 333 (E.D.Pa.1991) (applying Pennsylvania law), *aff'd in part and rev'd in part without op.,* 961 F.2d 209 (3d Cir.1992); *Crist v. Insurance Co. of N.Am.,* 529 F.Supp. 601, 603 (D.Utah 1982) ("The insurer's duty to defend corresponds to the insured's duty to relinquish control of the defense, and one cannot arise without the other."). In *Hoppy's Oil Serv., Inc.,* 783 F.Supp. at 1509, a federal district court, interpreting Massachusetts law, explained:

> No duty to defend or to participate in a defense can arise before the insurer has notice of the suit against the insured, or at least of the underlying claim and the likelihood of suit.

*Id.*[17] It makes no difference then, whether the insurers were unable to control defense costs before they were notified since they are not responsible for those costs in any event.

Beatrice insists that, in *Sarnafil, Inc. v. Peerless Ins. Co.,* 34 Mass.App. 248, 609 N.E.2d 1234 (1993), the Massachusetts Appellate Court effectively retreated from the "no pre-notice defense costs" rule stated in *Hoppy's Oil.* The court does not agree. A review of the facts of *Sarnafil* demonstrates that there was never any dispute in that case as to pre-notice defense costs. The plaintiff in that case, Sarnafil, supplied roofing materials for the Kansas City International Airport. *Id.* 609 N.E.2d at 1235. After a storm loosened the roof in two of the terminals, a dispute ensued between Sarnafil and D.C. Taylor Co. ("Taylor"), the builder that had installed the roof. *Id.* After receiving a written claim from Taylor, Sarnafil promptly notified its insurer, Peerless, asking the com-

---

**16.** Liberty Mutual identifies the following proceedings as solely attributable to improper conduct by the Beatrice attorneys: (1) the three-day hearing on the motion to set aside the verdict; (2) the appeal of the trial court's decision denying the motion to set aside the verdict; (3) the district court hearings on remand on the issue of setting aside the verdict; (4) the second appeal on the motion to set aside the verdict; (5) the filing of the state court action entitled *Robbins v. Ryan,* which Liberty Mutual describes as a strategy to bolster the petition for a writ of certiorari; and (6) a portion of the petition for writ of certiorari. (Liberty Mutual's Mem. at 20–21.)

**17.** It is not clear whether the rule derives from the need to trigger the duty to defend or from the rule that contractual rights can be waived. *Solo Cup Co.,* 619 F.2d at 1183 (trigger); *Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp.,* 790 F.Supp. 1318, 1330 n. 6, 1331 (E.D.Mich.1992) (waiver). In most cases, the existence of a "no voluntary payment" provision in the insurance contract provides another reason to deny pre-notice defense costs. *Lafarge Corp.,* 61 F.3d at 399. However, the absence of such a provision would not defeat the trigger or waiver analysis.

pany to "acknowledge coverage and its intention to provide a defense." *Id.* 609·N.E.2d at 1236.[18]

After a month passed with no response from Peerless, Sarnafil sent another letter requesting Peerless to give assurances of coverage and warning, "In the event Peerless fails or refuses to do so, Sarnafil will proceed in good faith as it thinks best and will charge Peerless for all expenses and costs incurred in defending itself against such allegations, including attorney's fees...." *Id.* A few more weeks passed with no answer, at which time Taylor notified Sarnafil of its intent to file suit in federal court. *Id.* 609 N.E.2d at 1236–37. Eventually, Peerless, under the erroneous belief that the occurrence was not covered under the policies, informed Sarnafil that it refused to provide a defense. *Id.* 609 N.E.2d at 1237.

On November 14, 1984, Sarnafil filed a demand for arbitration on the question of whether Taylor had a duty to indemnify Sarnafil for repairs it made to the roof. *Id.* On December 7, 1984, Taylor submitted to arbitration and filed a counterclaim for damages contending that Sarnafil's product was defective. *Id.* Sarnafil did not inform Peerless of the arbitration until April of 1985. Sarnafil prevailed in the arbitration, and proceeded to file suit against Peerless for the costs of its successful defense. *Id.* The district court granted summary judgment for the insurer, but the appellate court reversed, finding a question of fact as to whether Peerless was prejudiced by the delay in giving notice. *Id.* 609 N.E.2d at 1239–40.

The only issue on defense costs addressed in *Sarnafil* was whether the insured's delay in notifying the insurer of litigation (in that case, arbitration) prejudiced the insurer. The court did not evaluate whether Peerless could be held responsible for pre-notice defense costs. In fact, it is clear from the facts that the court did not need to address the

issue since, immediately after receiving Taylor's written claim, Sarnafil notified Peerless and requested that it acknowledge its defense obligations. *Id.* 609 N.E.2d at 1236. Since pre-notice defense costs were not at issue in *Sarnafil*, the court rejects Beatrice's argument that *Sarnafil* effectively overruled *Hoppy's Oil.*

The "no pre-notice defense costs" rule does not conflict with the "notice-prejudice" rule. For one thing, the two are contingent on separate acts. In deciding whether there is a duty to defend, the court must inquire into whether the insured tendered the defense to the insurer.[19] It often happens that the insured tenders the defense when it provides notice of the claim. However, courts recognize that the two are not identical. *Ex–Cell–O Corp.,* 790 F.Supp. at 1327–29 (citing 7C J. Appleman, *Insurance Law and Practice* § 4682 at 24 and *Hartford Accident & Indem. Co. v. Gulf Ins. Co.,* 776 F.2d 1380, 1382 (7th Cir.1985)). On the other hand, in deciding whether late notice has absolved an insurer of its duty to reimburse for defense costs, the court must evaluate if—considering when the insured gave notice of the occurrence or claim—the insurer was prejudiced. The lines of inquiry are separate.

Moreover, the policies that prompted courts to graft the prejudice requirement onto the notice requirement have little bearing on the question of pretender defense costs. The prejudice requirement was adopted to prevent complete forfeiture based upon technical failure of the insured to provide timely notice. In contrast, enforcement of the rule that pre-tender defense costs are not recoverable does not result in complete forfeiture of an insured's right to recover fees. Rather, the rule gives the insured the choice of defending some or all of a claim on its own. There are tactical reasons why an insured may want to withhold the defense from an insurer that clearly covers a risk.

---

18. Peerless had the right to defend any suit against Sarnafil that might be covered its policies. *Sarnafil, Inc.,* 609 N.E.2d at 1236 & n. 4. In addition, the policies prohibited Sarnafil from voluntarily making any payment, assuming any obligation, or incurring any expense. *Id.* 609 N.E.2d at 1236. Sarnafil, for its part, promised to forward " 'every demand, notice, summons, or

other process' it received related to the policies." *Id.* (quoting the policy provision).

19. Because a notice of claim often includes a request for defense coverage, courts tend to use the phrases "pre-notice defense costs" and "pretender defense costs" interchangeably.

For example, especially in a high-profile case, an insured may not want to lose control of events to the insurer. "An insured can waive some past defense cost coverage without waiving future coverage." *Ex–Cell–O Corp.*, 790 F.Supp. at 1330. Because the policies justifying the prejudice requirement do not apply to the tender requirement, courts have concluded that (at least between sophisticated parties) the "no pre-tender defense costs" rule remains viable even in jurisdictions that have adopted the "notice-prejudice" rule. *E.g., id.* at 1324–33 (applying Michigan law); *Safeguard Scientifics, Inc.*, 766 F.Supp. at 333 (applying Pennsylvania law); *Great Am. Ins. Co. v. Aetna Casualty & Sur. Co.*, 76 Hawai'i 346, 876 P.2d 1314, 1319–20 (1994) (applying Hawaii law); *SL Indus.*, 607 A.2d at 1272–73 (applying New Jersey law). *But see TPLC, Inc.*, 44 F.3d at 1492–93 (disagreeing with *Safeguard Scientifics, Inc.*).

Having concluded that the insurers are not liable for pre-notice defense costs, the court returns to the larger issue of whether the insurers were prejudiced by late notice. Given that the insurers are not liable for any defense costs incurred before they were brought into the action, their objection that they were unable to control costs rings hollow. If they suffered any prejudice it must be with respect to the costs that they might legally be obligated to pay.

As noted earlier, the insurers' principal objection relates to the amount of hours expended and the rates charged by Beatrice's attorneys. In the court's view, whether the total amount of Beatrice's fees is too high is irrelevant to the issue of prejudice. Prejudice occurs when "substantial rights have been irretrievably lost." *See Chemical Leaman Tank Lines, Inc.*, 817 F.Supp. at 1158. Under this definition, the insurers have not been prejudiced since the court can reduce the amount Beatrice recovers to compensate for any unreasonable attorneys' fees. Because the insurers have not lost their right to contest the amount of costs incurred, the court believes the insurers have not been prejudiced in this regard.

The court is not unsympathetic to the insurers' complaints. At the time Beatrice notified them, discovery was virtually completed, defense counsel had been selected and presumably many decisions regarding the strategy of the case had been made. The court recognizes that an insurer's right to make litigation decisions is extremely important. Had the insurers requested a continuance in order to prepare and been denied, or had they been notified after a verdict had already been entered against Beatrice, the court would be more inclined to find prejudice. However, these insurers had a meaningful opportunity to participate in the *Anderson* litigation. There was still time for National Surety to conduct active settlement negotiations and prepare for the first-phase trial. When Liberty Mutual received notice, a favorable verdict had already been rendered. In sum, considering that Beatrice is not seeking indemnification for damages, the insurers are not liable for pre-notice defense costs, and the insurers right to contest the amount of defense costs has not been irretrievably lost, the insurers cannot demonstrate that they suffered prejudice from late notice.

## B. Beatrice Insurers (Transport, CalUnion, Northbrook, Allianz)

Unlike Massachusetts, Illinois subscribes to the traditional rule that timely notice of an occurrence or claim is a condition precedent of the policy, the breach of which relieves an insurer of any duty to defend or indemnify. *Industrial Coatings Group, Inc. v. American Motorists Ins. Co.*, 276 Ill. App.3d 799, 213 Ill.Dec. 317, 322, 658 N.E.2d 1338, 1343 (1995); *Illinois Ins. Guar. Fund v. Lockhart*, 152 Ill.App.3d 603, 105 Ill.Dec. 572, 575–76, 504 N.E.2d 857, 860–61 (1987). Under Illinois law, "timely notice is not merely a technical requirement but a valid prerequisite to coverage." *Industrial Coatings Group, Inc.*, 213 Ill.Dec. at 322, 658 N.E.2d at 1343.

"The duty to notify arises on the day the insured receives information regarding an alleged incident which potentially might be covered under the insurance policy." *Id.; see also Twin City Fire Ins. Co. v. The Old World Trading Co.*, 266 Ill.App.3d 1, 203 Ill.Dec. 264, 268, 639 N.E.2d 584, 588 (1993) (citing *Hartford Casualty Ins. Co. v.*

*Snyders,* 153 Ill.App.3d 1040, 106 Ill.Dec. 827, 506 N.E.2d 627 (1987)). An insured must notify its insurer of a covered occurrence within a reasonable time considering all the facts and circumstances. *American Country Ins. Co. v. Efficient Constr. Corp.,* 225 Ill.App.3d 177, 167 Ill.Dec. 458, 460, 587 N.E.2d 1073, 1075 (1992). An insured is expected to act diligently and give notice as soon as it is practicable to do so. *Twin City Fire Ins. Co.,* 203 Ill.Dec. at 268, 639 N.E.2d at 588; *Illinois Valley Minerals Corp. v. Royal–Globe Ins. Co.,* 70 Ill.App.3d 296, 26 Ill.Dec. 629, 631–32, 388 N.E.2d 253, 255–56 (1979) (citing *McFarlane v. Merit Ins. Co.,* 58 Ill.App.3d 616, 16 Ill.Dec. 176, 178, 374 N.E.2d 951, 953 (1978)). Although reasonableness is usually a question of fact for the jury, if there is no controversy as to the facts, the court may decide the issue as a matter of law. *Twin City Fire Ins. Co.,* 203 Ill.Dec. at 268, 639 N.E.2d at 588.

■ Beatrice, a sophisticated insured, cannot claim that it did not understand the standard notice requirements in its insurance policies. *See Highlands Ins. Co. v. Lewis Rail Serv. Co.,* 10 F.3d 1247, 1250 n. 3 (7th Cir.1993). Beatrice's attorneys believed the insurance policies could be implicated as soon as they received the *Anderson* complaint. (*See* Liberty Mutual's Mem.Ex. I.) [20] In fact, discussions between Beatrice and its attorneys regarding the possibility of insurance coverage began, at the latest, some time during 1984. (*See* Allianz's 12(m) Stmt.Ex. G.) On December 4, 1984, in a belated answer to the company's inquiry regarding insurance coverage, Beatrice's attorney explained:

> As you know, we do not know of the existence of any comprehensive general liability policies either held by Beatrice or previously held by J.J. Riley. We were concerned however that the possibility of coverage under a CGL policy, were any to exist, should not be disregarded simply because such policies contain a "pollution exclusion" clause.

(Allianz's 12(m) Stmt.Ex. G at 1.) The letter concludes with a request that Beatrice examine the insurance policies and inform the attorneys of the result. (Allianz's 12(m) Stmt.Ex. G. at 3.) In April of 1985, after receiving no response, Beatrice's attorney wrote a follow-up letter reminding Beatrice to explore the possibility of insurance coverage for the *Anderson* litigation. (Beatrice's 12(n) Stmt.Milota Ex. at last page.) From the facts, it is clear that Beatrice understood the importance of giving notice and was instructed to do so before December of 1984. Nevertheless, none of the Beatrice carriers were notified before January of 1986. The court concludes that it was unreasonable as a matter of law for Beatrice to proceed on its own for more than a year after it was instructed that the policies could provide coverage. *See Lockhart,* 105 Ill.Dec. at 576, 504 N.E.2d at 861 (two-year delay unreasonable); *Equity General Ins. Co. v. Patis,* 119 Ill. App.3d 232, 74 Ill.Dec. 846, 850, 456 N.E.2d 348, 352 (1983) (four-and-a-half month delay unreasonable); *Illinois Valley Minerals Corp.,* 26 Ill.Dec. at 632, 388 N.E.2d at 256 (6–month delay unreasonable).

■ "A lengthy passage of time is not an absolute bar to coverage provided the insured has a justifiable excuse for the delay." *Efficient Constr. Corp.,* 167 Ill.Dec. at 460, 587 N.E.2d at 1075. Beatrice explains that it immediately notified Gallagher–Bassett of the *Anderson* claims and believed that, if notice to any of the carriers was required, Gallagher–Bassett would take care of it. Beatrice insists that its claims administrator was at fault for not providing earlier notice. Beatrice adds that it notified the insurers when it realized Gallagher–Bassett had not. In the court's view, Beatrice has not provided a legally sufficient excuse for the delay. Beatrice does not claim that Gallagher–Bassett ever mislead it regarding whether notice had been sent. Moreover, Beatrice cites no authority that would place the risk of miscommunication between Beatrice and its claims administrator on the insurers. On the contrary, since it was Beatrice's responsibility to

---

**20.** On June 14, 1982, within a month Beatrice's receiving the complaint, one of Beatrice's attorneys wrote a file memo outlining "matters that require preliminary attention in the lawsuit."

(Liberty Mutual's Mem.Ex. I at 1.) The memorandum suggested that Beatrice explore the availability of insurance and notify appropriate carriers. (Liberty Mutual's Mem.Ex. I at 3.)

provide written notice, Beatrice (and not the insurers) must assume the risk of delegating the duty. *Illinois Valley Minerals, Corp.,* 26 Ill.Dec. at 633, 388 N.E.2d at 257 ("The obligation to give notice is imposed upon the insured, and only the insured, by reason of the contract or insurance . . . ."); *see also INA Ins. Co. v. City of Chicago,* 62 Ill.App.3d 80, 19 Ill.Dec. 519, 522, 379 N.E.2d 34, 37 (1978) (insured could not rely on notice given to insurance administrator). As such, that Beatrice timely notified its claims administrator justify its delay in providing the insurers with notice of the *Anderson* claims earlier.

Under Illinois law, it is not enough that Beatrice was successful in the *Anderson* trial. While prejudice is a factor the court must consider, "an insured's lack of diligence is not overlooked merely because the insurer has failed to show actual prejudice due to the delay." *Illinois Valley Minerals, Corp.,* 26 Ill.Dec. at 631, 388 N.E.2d at 255 (quoting *McFarlane,* 16 Ill.Dec. at 178, 374 N.E.2d at 953); *see Lockhart,* 105 Ill.Dec. at 575–76, 504 N.E.2d at 860–61; *Twin City Fire Ins. Co.,* 203 Ill.Dec. at 269, 639 N.E.2d at 589 (stating that lack of prejudice to the insurer is a factor to be considered only where the insured has a good excuse for the late notice or where the delay was relatively brief). The risk was great that the insurers would be unable to effectively defend the claims on such short notice. There being no legitimate excuse for the delay, the court concludes that the notice was unreasonable as a matter of law.

### C. Beatrice Excess Insurers (CalUnion, Northbrook and Allianz)

 Beatrice insists that, even if there was no legal justification for its delay in notifying Beatrice's primary carriers of the *Anderson* claims, it was not required to notify the excess carriers earlier. Beatrice contends that, with respect to excess carriers, prejudice is a "determinative factor." (Beatrice's Mem. on Late Notice at 17–26; Beatrice's Resp. to Insurer's Supp.Mem. at 5.)

In theory, courts treat primary carriers and "true excess carriers" differently with respect to notice because the latter, unlike the former, have no duty to defend or right to control the defense. *See First State Ins. Co. v. Montgomery Ward & Co.,* 267 Ill.App.3d 851, 204 Ill.Dec. 814, 817, 642 N.E.2d 715, 718 (1994); *Atlanta Int'l Ins. Co. v. Checker Taxi Co.,* 214 Ill.App.3d 440, 158 Ill.Dec. 228, 231, 574 N.E.2d 22, 25 (1991); *Brownlee v. Western Chain Co.,* 74 Ill.App.3d 804, 30 Ill.Dec. 479, 483, 393 N.E.2d 515, 519 (1979) (describing the fundamental differences between primary and excess policies) (citing *Greyhound Corp. v. Excess Ins. Co.,* 233 F.2d 630, 634 (5th Cir.1956)). Since the only obligation of an excess carrier is to provide coverage once primary insurance has been exhausted, an excess insurer's need for prompt notice is not as great as a primary insurer's. *See Montgomery Ward & Co., Inc.,* 204 Ill.Dec. at 817, 642 N.E.2d at 718; *Atlanta Int'l Ins. Co.,* 158 Ill.Dec. at 231, 574 N.E.2d at 25; *Brownlee,* 30 Ill.Dec. at 483, 393 N.E.2d at 519.

This court recognizes that it is ordinarily more important for a primary carrier to receive prompt notice. Nevertheless, the principal reason for treating an excess insurer differently is that an excess insurer expects the claim to be defended by the primary insurer. *Trustees of Univ. of Pa. v. Lexington Ins. Co.,* 815 F.2d 890, 898–99 (3d Cir. 1987) ("notice to a primary carrier generally ensures a competent and intelligent defense.") Typically, the interests of a primary and an excess insurer in defending and settling a claim are identical.[21] As such, so long as the primary insurer has been notified in a timely manner, an excess insurer should not be adversely affected by a delay. However, where the primary insurer receives late notice, the main reason for treating an excess insurer no longer exists. *See Twin City Fire Ins. Co.,* 203 Ill.Dec. at 266, 639 N.E.2d at 586 (finding notice untimely when, by the time insured notified any carrier, it had already incurred over $500,000 in attorneys fees and taken over 41 depositions).

---

**21.** Although, an excess insurer has a greater incentive to promote a settlement within the limits of the primary coverage.

In any event, the language of the notice provisions already accounts for the differences between primary and excess insurers. While primary policies typically require immediate notice of claims, excess policies require notice "when it appears likely" that a claim will invoke the excess policy. *See, e.g., Montgomery Ward & Co.*, 204 Ill. Dec. at 817, 642 N.E.2d at 718; *Brownlee*, 30 Ill.Dec. at 483, 393 N.E.2d at 519. By allowing an insured to withhold notice "until coverage appears likely," excess insurers give the insured some discretion to decide when the time has come to alert an excess carrier. *Montgomery Ward & Co.*, 204 Ill.Dec. at 817, 642 N.E.2d at 718; *Hartford Accident & Indem. v. Rush Presbyterian–St. Luke's Medical Ctr.*, 231 Ill.App.3d 143, 172 Ill.Dec. 641, 645, 595 N.E.2d 1311, 1315 (1992); *Brownlee*, 30 Ill.Dec. at 483, 393 N.E.2d at 519. In order to avoid liability on the basis of late notice, an excess insurer must demonstrate that the insured abused the discretion afforded under the provision. *Rush Presbyterian–St. Luke's Medical Ctr.*, 172 Ill.Dec. at 646, 595 N.E.2d at 1316. To determine whether this discretion was abused, the court must decide whether the insured gave notice when it concluded that the excess insurance policy was implicated and whether the insured acted reasonably in withholding notice up to that point. *Id.* 172 Ill.Dec. at 645, 595 N.E.2d at 1315; *Atlanta Int'l Ins. Co.*, 158 Ill.Dec. at 231, 574 N.E.2d at 25. Prejudice to the insurer is an important factor in determining the reasonableness of an insured's decision to notify an excess carrier but, contrary to Beatrice's view, it is not dispositive. *Montgomery Ward & Co.*, 204 Ill.Dec. at 817, 642 N.E.2d at 718; *Rush–Presbyterian St. Luke's Medical Center*, 172 Ill.Dec. at 645, 595 N.E.2d at 1315; *Sisters of Divine Providence v. Interstate Fire & Casualty Co.*, 117 Ill.App.3d 158, 72 Ill.Dec. 731, 733–34, 453 N.E.2d 36, 38–39 (1983); *Highlands Ins. Co.*

*v. Lewis Rail Serv. Co.*, 10 F.3d 1247, 1250 & n. 3 (7th Cir.1993).

Beatrice notified the excess insurers in January of 1986—even though the question of insurance coverage had been raised as early as 1984. (*See* Allianz's 12(m) Stmt.Ex. G; Beatrice's 12(n) Stmt.Milota Ex. at last page.) Even if Beatrice had not formally concluded in 1982 that the excess policies were implicated, it should have. The number of *Anderson* plaintiffs and the extent of the injuries they alleged should have sent a strong signal to Beatrice that its exposure exceeded the $500,000 primary coverage provided by Transport. *See Sisters of Divine Providence*, 72 Ill.Dec. at 732–33, 453 N.E.2d at 37–38 (insured presumed to have "actual knowledge" from which it could reasonably conclude claim had arisen under excess policy where injuries alleged were catastrophic); *Montgomery Ward & Co.*, 204 Ill.Dec. at 817, 642 N.E.2d at 718 (amount of ad damnum relevant, but not conclusive). On the basis of the undisputed facts, the court concludes that Beatrice had actual knowledge that its potential liability would likely exceed the primary policies several years before it notified the excess insurers and that this delay was unreasonable as a matter of law.[22]

## II. POLLUTION EXCLUSION

Having rejected the late notice defenses of National Surety and Liberty Mutual, the court turns to the question of whether those insurers had a duty to defend Beatrice in the *Anderson* litigation. The insurers argue that they had no such duty because the allegations of the underlying lawsuit fell within the terms of the pollution exclusion provisions of their contracts.

The duty to defend is determined by comparing the allegations of the complaint against the insured with the language of the policy at issue. *Liberty Mut. Ins. Co. v. SCA Servs., Inc.*, 412 Mass. 330, 588 N.E.2d 1346,

---

22. Having determined that notice to the Beatrice carriers was unreasonable as a matter of law, relieving the insurers of their duties under the policy, the court need not address the insurers' liability for pre-tender defense costs. Nevertheless, the court notes that, under Illinois law, a sophisticated insured must tender the defense in order to trigger an insurer's duty to defend.

*E.g., Hartford Accident & Indem. Co. v. Gulf Ins. Co.*, 776 F.2d 1380, 1383 (7th Cir.1985); *Solo Cup Co. v. Federal Ins. Co.*, 619 F.2d 1178, 1183 (7th Cir.), *cert. denied*, 449 U.S. 1033, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980); *Institute of London Underwriters v. Hartford Fire Ins. Co.*, 234 Ill. App.3d 70, 175 Ill.Dec. 297, 299–301, 599 N.E.2d 1311, 1313–15 (1992).

1347 (1992); *Landauer, Inc. v. Liberty Mut. Ins. Co.*, 36 Mass.App. 177, 628 N.E.2d 1300, 1302 n. 12 (1994).[23] If the allegations of the complaint are "reasonably susceptible" to an interpretation that they state a claim covered by the policy, the insurer has a duty to defend. *Id.* (citing *Continental Casualty Co. v. Gilbane Bldg. Co.*, 391 Mass. 143, 461 N.E.2d 209, 212 (1984)); *Landauer, Inc.*, 628 N.E.2d at 1302 n. 12. In other words, the court should consider " 'what kinds of losses may be proved as lying within the range of the allegations of the complaint, and then see[ ] whether any such loss fits the expectation of protective insurance reasonably generated by the terms of the policy.' " *Gilbane Bldg. Co.*, 461 N.E.2d at 212 (quoting *Sterilite Corp. v. Continental Casualty Co.*, 17 Mass.App. 316, 458 N.E.2d 338, 341 (1983)); *accord SCA Servs., Inc.*, 588 N.E.2d at 1347–48.

The Liberty Mutual and National Surety policies contain standard pollution exclusions removing coverage for:

> Bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water.

(Stip.App.Ex. 13 at 4; Stip.App.Ex. 15 at 1.) The exclusions do not apply, however, "if such discharge, dispersal, release or escape is sudden and accidental." Because the *Anderson* complaints alleged the release of contaminants into the wells, the insurers had a duty to defend Beatrice only if the underlying complaint was reasonably susceptible to an interpretation that the discharge of pollutants was sudden and accidental.[24] *See SCA Servs., Inc.*, 588 N.E.2d at 1349.

Neither the Massachusetts Supreme Judicial Court nor the Appeals Court has definitively decided whether the insurer or the insured bears the burden of proving that a claim falls within the sudden and accidental exception to a pollution exclusion. *See Polaroid Corp. v. Travelers Indem. Co.*, 414 Mass. 747, 610 N.E.2d 912, 916 n. 7 (1993) ("[W]e need not decide whether the insurer or the insured has the burden of proof on the question of the sudden and accidental nature of any discharge."); *Interex Corp. v. Atlantic Mut. Ins. Co.*, 874 F.Supp. 1406, 1416 (D.Mass.1995). Generally, the insured bears the burden of proving that a loss is covered by the policy. *Interex Corp.*, 874 F.Supp. at 1416 (citing 19 G. Couch, *Couch on Insurance*, § 79:315 (2d ed.1983)). Once that burden is satisfied, the burden is on the insurer to demonstrate that a policy exclusion eliminates coverage for the loss. *Id.* The majority of states now place the burden of proving an exception to an exclusion back on the insured. *Id.* (citing cases from various jurisdictions). This approach makes sense given that the burden of demonstrating coverage is on the insured. *Id.* at 1417; *see also Aeroquip Corp. v. Aetna Casualty & Sur. Co.*, 26 F.3d 893, 894–95 (9th Cir.1994) (per curiam) (determining that majority of jurisdictions require the insured to prove applicability of sudden and accidental exception to pollution exclusion). This court agrees with the sound analysis in *Interex Corp*, 874 F.Supp. at 1416–17, and concludes that Massachusetts would place the burden on the insured. *See also Covenant Ins. Co. v. Friday Eng'g*, 742 F.Supp. 708, 711 (D.Mass.1990) (predicting that Massachusetts would place burden of proving "sudden and accidental exception" on insured).

Under Massachusetts law, only an abrupt discharge or release of pollutants falls

---

**23.** The duty to defend is determined from the facts alleged in the complaint, whereas the duty to indemnify is determined from facts proved at trial. *See Continental Casualty Co. v. Gilbane Bldg. Co.*, 391 Mass. 143, 461 N.E.2d 209, 212 (1984).

**24.** The court declines to consider Beatrice's evidence that the insurers described the pollution exclusion to regulatory entities as a clarification—not a limitation—of coverage. Because Massachusetts courts have found unambiguous

the pollution exclusion, along with the sudden and accidental language, this evidence is irrelevant. *See Polaroid Corp. v. Travelers Indem. Co.*, 414 Mass. 747, 610 N.E.2d 912, 916 n. 7 (1993) (concluding that the sudden and accidental exception was not ambiguous and declining to consider drafting and regulatory history of the provision); *Lumbermens Mut. Casualty Co. v. Belleville Indus., Inc.* ("Belleville I"), 407 Mass. 675, 555 N.E.2d 568, 573 (1990) (same).

within the sudden and accidental exception to the pollution exclusion. *Goodman v. Aetna Casualty & Sur. Co.*, 412 Mass. 807, 593 N.E.2d 233, 235 (1992); *SCA Servs., Inc.*, 588 N.E.2d at 1349; *Lumbermens Mut. Casualty Co. v. Belleville Indus., Inc. ("I")*, 407 Mass. 675, 555 N.E.2d 568, 572 (1990); *Landauer, Inc.*, 628 N.E.2d at 1302. The temporal element of the discharge is critical. *I*, 555 N.E.2d at 572; *Landauer, Inc.*, 628 N.E.2d at 1302.

> While the cause of the release does not determine whether the exception to the pollution exclusion clause is applicable, it may well be informative in deciding whether the release was abrupt. For example, a sudden cause (like a pile driven into a gasoline tank), or the sudden development of a condition (like a ground shift that ruptures piping) might guide the decision whether a given release of pollutants was due to a momentary event, and therefore, was abrupt.

*Goodman*, 593 N.E.2d at 235; *see Nashua Corp. v. First State Ins. Co.*, 420 Mass. 196, 648 N.E.2d 1272, 1275 & n. 11 (1995) (nature of insured's business is relevant to determining whether release was sudden and accidental); *Lumbermens Mut. Casualty Co. v. Belleville Indus., Inc. ("II")*, 938 F.2d 1423, 1429–30 (1st Cir.1991), *cert. denied*, 502 U.S. 1073, 112 S.Ct. 969, 117 L.Ed.2d 134 (1992) (nature of insured's enterprise and historical operations determine applicability of sudden and accidental clause). With these standards in mind, the court turns to the allegations in the *Anderson* complaint.

There is nothing in the complaint suggesting that release of contaminants was sudden. The relevant allegations are as follows:

> 1. For many years until May, 1979, the groundwater used by plaintiffs and plaintiffs' decedents for drinking and household purposes was contaminated with toxic chemicals disposed of by defendants....
>
> 33. Defendant John J. Riley Company located at 228 Salem Street in East Woburn, was between 1909 and 1978 a family business owned and run by Mr. John J. Riley. In December of 1978, the Riley Company became a division of Beatrice Foods, Inc.

> The defendant operates a tannery at the Woburn site....
>
> 35. Beatrice Foods also owns an undeveloped site of 14.73 acres, situated just to the northeast of the tannery, bordering the Aberjona River. This site has been used as a dump for chemical wastes.
>
> 52. West and southwest of Wells G and H lies a 15–acre undeveloped plot of land owned by Beatrice Foods. The land is bordered by the Aberjona River on the east and railroad tracks on the west. It has a private well located at the southern tip of the property.
>
> 53. The land consists of a wooded field and marshlands. There is a well-defined dirt road located next to the marshland along which are deposited numerous tanks and drums. The drums are in various conditions: new and rusted, open and closed. Drums have also been deposited near the railroad tracks. There are some areas of distressed vegetation, indicating spills of hazardous materials.
>
> 53.5. During the period of operation of Wells G and H, John J. Riley Co. and Beatrice Foods disposed of or allowed to be disposed chemical waste products, organic solvents including trichloroethylene and other wastes on their property.
>
> 54. Chemicals deposited on this site have seriously contaminated the groundwater as evidenced by the level of contamination in the private well on site.... These contaminants are solvents that are slightly soluble and denser than water. They have entered the groundwater in the vicinity of Wells G and H, moved toward the bottom of the aquifer, and been drawn toward the wells by the cone of influence created by Wells G and H and/or by gravity along the slope of the bedrock.

## CAUSES OF ACTION

> E. The handling and disposal of hazardous chemical substances on defendant's property resulted in their escape into the surrounding environment....
>
> F. The escape of hazardous chemical substances handled and disposed of on defen-

dant's property has caused plaintiffs to be unreasonably exposed to chemicals . . . .

L. Defendants failed to exercise due care in the manufacture, use, control, and/or disposal of such chemicals.

V. The continued disposal of hazardous substances on the ground and the continued presence of hazardous substances in the soil of defendants' property in East Woburn constitutes a further threat to the groundwater . . . .

(Stip.App.Ex. 16(e) (Fourth Amended Complaint).) The gist of the complaint is that the Riley tannery generated wastes that were routinely deposited into the ground at the 15–acre tract. The complaint indicates that dumping continued over an extended period of time via a well-defined dirt road. The fact that there were several different patches of distressed vegetation suggests that there were many different leaks. This, in addition to the allegation that the drums varied in age, indicates that the releases occurred at different times. In the court's view, the only reasonable reading of the complaint is that the releases were gradual.

The court pauses to note that, to the very end, the theory of the *Anderson* plaintiffs was that the 15–acre tract was contaminated because defendants had negligently permitted others to dump toxic wastes there or had, themselves, dumped wastes on the land. *See generally Anderson,* 129 F.R.D. 394 (describing plaintiffs' theory of the case and outlining evidence regarding dumping on the land). It was never their position that the contamination was the result of a sudden and accidental release. Thus, even if the court looked beyond the allegations to the facts known by the insured and the insurer, there would be no basis for holding the insurers to a duty to defend.[25]

■ Only an extraordinarily imaginative reading could support Beatrice's theory that the *Anderson* complaint embodies a discrete

polluting occurrence. The *Anderson* complaint is utterly devoid of any allegations that a sudden and accidental event lead to the contamination of the groundwater. In fact, Beatrice is unable to point to any single word that might reasonably suggest something other than routine dumping. *See Covenant Ins. Co.,* 742 F.Supp. at 712–13 (concluding there was no duty to defend where insured failed to establish that a sudden and accidental discharge occurred at the site). Although the burden on the insured on the issue of the duty to defend is light, the court need not (and should not) indulge in sheer conjecture. *SCA Servs., Inc.,* 588 N.E.2d at 1351 (declining to speculate on the nature of the releases when a "reasonable reading of the allegations [suggested] that the entire pattern of conduct was not a 'sudden and accidental' occurrence."); *accord Landauer, Inc.,* 628 N.E.2d at 1302–03.

■ Beatrice seems to misunderstand the inquiry the court must undertake. The question is not whether it is *"impossible* to envision a claim based upon sudden and accidental releases." (Beatrice's Mem. on Pollution Exclusion at 12–13.) Rather, the question is whether the complaint is reasonably susceptible to an interpretation that the release was sudden and accidental. *See SCA Servs., Inc.,* 588 N.E.2d at 1350–51 (rejecting insured's argument that there is a duty to defend so long as there is "a possibility that the liability claim falls within the insurance coverage"). It may be possible to envision a sudden and accidental release, but not reasonable to do so given the allegations of the complaint. As one court put it, Massachusetts has rejected the "perhaps-there-is-a-covered-claim-lurking" theory advanced by many insureds. *Aetna Casualty & Sur. Co. v. George,* Nos. 861625, 882184, 911070, 1994 WL 879761, at *5 (Mass.Super. May 24, 1994) (citing *SCA Servs., Inc.,* 588 N.E.2d at 1350–51).[26]

---

**25.** Where the duty to indemnify is disputed, courts look to the facts developed at trial. *See, e.g., Nashua Corp.,* 648 N.E.2d at 1275; *Hazen Paper Co. v. United States Fidelity & Guar. Co.,* 407 Mass. 689, 555 N.E.2d 576, 579 (1990); *Goodman,* 593 N.E.2d at 235–36; *Polaroid,* 610 N.E.2d at 915–16. The absence of any facts showing that the release was sudden and acci-

dental coupled with the fact that this case involves only the duty to defend, not the duty to indemnify, distinguishes the cases cited *supra.*

**26.** Although Massachusetts courts construe ambiguous policy language in favor of the insured, *see, e.g., Nashua Corp.,* 648 N.E.2d at 1274, they have not embraced a rule that would invariably

Under this approach, a duty to defend will not be found simply because the complaint does not describe precisely how quickly the contaminants were released. In fact, because federal courts cannot expect a high level of specificity at the pleading stage, it is particularly appropriate to rely on common sense inferences in evaluating the duty to defend. *See Terrio*, 450 N.E.2d at 193 ("Courts operating under notice pleading have generally determined that there is no duty to defend unless facts alleged in the complaint, or known or readily knowable by the insurer, place liability within the coverage of the policy.") So long as a reasonable reading of the allegations would lead a person of ordinary intelligence to conclude that the contamination was gradual, there is no duty to defend. *SCA Servs., Inc.*, 588 N.E.2d at 1350.

The allegations in this case do not differ materially from the allegations the Massachusetts Supreme Judicial Court found to describe a gradual release in *SCA Services, Inc.*, 588 N.E.2d 1346. In that case, SCA had transported industrial and chemical wastes for disposal in a landfill. *Id.* 588 N.E.2d at 1348. As the court described it, "[t]he complaint detail[ed] routine business activity lasting over several months...." *Id.* 588 N.E.2d àt 1349–50. The precise allegations were as follows:

"24. In 1973, SCA, through its agents, servants and employees, contacted [the landfill operator] and arranged to dispose of industrial and chemical wastes at the ... landfill site.

25. Pursuant to this arrangement, several thousand barrels of industrial and chemical wastes were transported to the site by

SCA during 1973 and 1974. Many of these wastes contained 'hazardous substances.'

26. SCA delivered these wastes to the site in trucks driven by its own employees, or contracted with private parties to drive SCA trucks containing wastes to the site.

27. At the time SCA arranged for disposal of these wastes, it knew or should have known that they were noxious, dangerous and hazardous substances, and could harm the land, water and air resources of the State of New York and human, animal and plant life if they were not disposed of in a manner which would prevent their release into the environment.

28. SCA knew or should have known that these wastes were deposited directly into the ground at the site in trenches dug for that purpose.

46. Wastes accepted by [the landfill operator] were disposed of at the site in trenches dug by him for that purpose. Barrels of waste were dumped into the open trenches and flattened with a bulldozer, or the contents of the barrels were emptied into the trenches and the barrels salvaged for reuse."

The complaint goes on to assert that "[h]azardous substances disposed of at the site remain there in open trenches, in the ground and groundwater. Wastes deposited at the site have been and continue to be released into the air, soil and groundwater in the vicinity of the site and into the Delaware River."

*Id.* 588 N.E.2d at 1348 (quoting complaint). The Massachusetts Supreme Judicial Court reasoned, as does this court, that "[t]o an ordinary intelligent person reading the com-

---

construe silences in a complaint in favor of a duty to defend. *See Belleville I*, 555 N.E.2d at 571 (declining to base legal conclusions on view that insurance coverage is desirable). Thus, Massachusetts courts have been less indulgent than other courts when it comes to speculating about silences in the complaint. *See Solo Cup*, 619 F.2d at 1183–87 (reasoning that, although it was impossible to determine which theory of recovery was addressed in the underlying complaint, the complaint could present a theory of recovery within the policy coverage since, under notice pleading plaintiffs would have been entitled to prove their claims based upon a "sudden and accidental" release). There is nothing inher-

ently unfair about requiring an insured to defend itself where the complaint suggests that there will be no insurance coverage. If, during discovery, the insured uncovers facts demonstrating coverage there is nothing to prevent the insured from then enforcing the duty to defend. *Belleville I*, 555 N.E.2d at 575 (determination that general complaint did not give rise to duty to defend would not foreclose such duty if facts eventually revealed otherwise); *Terrio v. McDonough*, 16 Mass.App. 163, 450 N.E.2d 190, 193 (1983) (insurer acts at its own peril when it refuses to defend because facts may develop bringing claim within policy coverage).

plaint ... it is evident that [the plaintiff] asserts contamination of the site, and the surrounding area and waters due to continuous waste disposal practices occurring over a protracted period of time as a concomitant part of regular business activity. Such a situation is ... not 'sudden and accidental.'" *Id.* 588 N.E.2d at 1350. The allegations in the *Anderson* complaint do not differ in any material way from the conduct alleged in *SCA Services*. Because no "ordinary intelligent person" could read the complaint as alleging a sudden and accidental release, the court concludes that the Liberty Mutual and National Surety had no duty to defend.

### Conclusion

For the reasons stated above, the court grants the motions for summary judgment of Transport, Allianz, Northbrook, National Surety, Liberty Mutual and CalUnion. Beatrice's motions for summary judgment and partial summary judgment are denied. What remains of this case is Beatrice's negligence claim against its insurance broker and insurance administrator. The court instructs the parties to discuss settlement before the next status which is set for April 19, 1996 at 9:00.

### ORDER

Before the court is Beatrice's Motion to Alter and Amend the Memorandum Opinion and Order entered April 3, 1996. For the reasons stated below, the motion is granted in part and denied in part.

### I. LIBERTY MUTUAL'S PRE–1972 LIABILITY

The court agrees with Beatrice that the minute orders and the conclusion line of the opinion should clarify that summary judgment for Liberty Mutual was granted only to post–1972 coverage. As the court noted in footnote 4 of the opinion, only the post–1972 policies were at issue on the motions. Nevertheless, Liberty Mutual insists that the opinion effectively disposed of any claim under the pre–1972 policies. Liberty Mutual reasons that since it is not liable for pre-notice costs and since all post-notice costs involved misconduct, it cannot be liable at all.

This argument is flawed for two reasons: (1) the court has never indicated that the insurers cannot be held liable for costs associated with attorney misconduct and (2) the argument is based on a very loose reading of the opinion and clearly some of the post-notice defense costs were related to defending the jury verdict. In the end, several questions remain as to Liberty Mutual's liability: (1) whether Liberty Mutual actually issued pre–1972 policies to Riley and, if so; (2) whether the pre–1972 policies contained pollution exclusions; (3) whether the fees requested are reasonable; (4) whether bodily injury occurred during Liberty Mutual's policy period; (5) whether Beatrice can recover under the policies since Riley was the named insured; and (6) whether Liberty Mutual is liable for Rule 11 sanction fees. Therefore, the court will amend the minute orders and the conclusion line of the opinion to reflect that the court granted only partial summary judgment to Liberty Mutual.

### II. BEATRICE'S MOTION ON LATE NOTICE DEFENSES

The court agrees with Beatrice that the minute orders and conclusion line of the opinion incorrectly state that all of Beatrice's motions were denied. The orders should be amended to reflect that Beatrice's Cross–Motion for Summary Judgment on Liberty Mutual and National Surety's Defense of Prejudice from Delayed Notice [docket # 279] was granted.

### III. BEATRICE'S MOTION ON TRANSPORT'S PRE–MERGER LIABILITY

The minute orders and conclusion line of the opinion state that Beatrice's cross motion for summary judgment on Transport's pre-merger Liability was denied. In the opinion, the court resolved Transport's liability on the basis of late notice without addressing the issue of Transport's pre-merger liability. Beatrice asks that the orders be amended to clarify that the court did not analyze the issue. In the court's view, it is apparent from the opinion that there was no need to address the pre-merger liability issue. Given the court's analysis of the issues, there is

nothing improper about describing the court's disposition of the motion on pre-merger liability as a denial.

### Conclusion

Beatrice's Motion to Alter and Amend is granted in part and denied in part. Any motions to reconsider should be filed within the time-frame permitted under the Federal Rules of Civil Procedure. Memoranda in support should be filed by 06/07/96.

**A. Minute Order entered 3/29/96 doc. # [402] should read:**

Granting the motions for summary judgment of Transport Ins. Co. doc. # [271–1], Allianz Underwriters doc. # [275–1], Northbrook Ins. Co. doc # [278–1], National Surety Cor. doc. # [281–1], and CalUnion doc. # [292–1]. Liberty Mutual's motion for summary judgment doc. # [283–1] as to post–1972 coverage, construed as a motion for partial summary judgment, is granted. Denying Beatrice's motions for summary judgment and partial summary judgment docs. # [282–1], [286–1], and [288–1]. Granting Beatrice's motion for summary judgment doc. # [279–1]. Memorandum opinion and order to issue on 04/01/96.

**B. Conclusion section of Memorandum Opinion and Order entered 04/03/96 doc. # [403] should read:**

For the reasons stated above, the court grants the motions for summary judgment of Transport, Allianz, Northbrook, National Surety and CalUnion. Liberty Mutual's motion for summary judgment as to post–1972 coverage, construed as a motion for partial summary judgment, is granted. Beatrice's motion for summary judgment on Liberty Mutual and National Surety's Defense of Prejudice from Late Notice is granted but Beatrice's remaining motions for summary judgment and partial summary judgment are denied. What remains of this case is Beatrice's claim against Liberty Mutual for coverage under pre–1972 policies and Beatrice's negligence claim against its insurance broker and insurance administrator. The court instructs the parties to discuss settlement be-fore the next status which is set for April 19, 1996 at 9:00.

**C. Minute Order entered 04/03/96 doc. # [404] should read:**

Status hearing set for 04/19/96 at 9:00 a.m. Pursuant to memorandum opinion and order, the court grants the motions for summary judgment of Transport, Allianz, Northbrook, National Surety, and CalUnion. Liberty Mutual's motion for summary judgment as to post–1972 coverage, construed as a motion for partial summary judgment, is granted. Beatrice's motion for summary judgment on Liberty Mutual and National Surety's Defense of Prejudice from Late Notice is granted but Beatrice's remaining motions for summary judgment and partial summary judgment are denied. What remains of this case is Beatrice's claim against Liberty Mutual for coverage under pre–1972 policies and Beatrice's negligence claim against its insurance broker and insurance administrator. The court instructs the parties to discuss settlement before the next status.